IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

RICK J. SEEBERGER and SUSAN SEEBERGER,
*doing business as* BUILD A STRONG FUTURE,

     Plaintiffs,

v.                                          Case No. 2:14-cv-1063-GBW-WPL

PETTER POWERS GOODMAN, et al.,

     Defendants.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiffs' Motion of [sic] Leave to File Amended Complaint, *doc. 117*, Defendants' Motions to Dismiss, *docs. 13*, *16*, *32*, *& 89*, and Plaintiffs' requests for default and default judgment, *docs. 21-23*, *90-92*, *& 103*. Having reviewed the requests and Motions, and the attendant briefing, and being otherwise fully advised, the Court will DENY Plaintiffs' Motion of Leave to File Amended Complaint, *doc. 117*, and Plaintiffs' requests for default and default judgment, *docs. 90-92*, *& 103*, and will GRANT Defendants' Motions to Dismiss, *docs. 13*, *16*, *32*, *& 89*. Furthermore, having dismissed the federal claims, the Court declines to exercise supplemental jurisdiction over the state counterclaims brought by Defendants Lerma, Long, and Kinney. Those counterclaims will, therefore, be dismissed without prejudice.

## I.   PROCEDURAL POSTURE

Plaintiff Rick Seeberger (Plaintiff[1]) is a consultant employed by Build a Strong Future, a company owned by his wife, Plaintiff Susan Seeberger.  This case arises from various alleged wrongdoings by Defendants in connection with Plaintiff's service as a consultant to the Doña Ana County Sheriff's Office (DASO) and later as Chief of Staff to Sheriff Todd Garrison, a position from which he was eventually terminated.  Plaintiffs bring claims against members of DASO, various County officials, a contributor to the Las Cruces Sun-News newspaper, and the company that owns Sun-News.

Plaintiffs are proceeding *pro se* in this action.  Plaintiffs' Original Complaint was filed in state court in October 2014 and was removed to this Court on November 21, 2014.  *Doc. 1.*  Since then, Plaintiffs have filed multiple "notices" asserting that various Defendants are in default for failing to timely file responsive pleadings.  *See, e.g., docs. 21-23*. Plaintiffs also attempted to file an amended complaint, *doc. 105*, but it was stricken for failure to comply with the Federal Rules.  *Doc. 116*.  Subsequently, Plaintiffs filed the instant Motion of Leave to File Amended Complaint, *doc. 117*.  All of the Defendants[2] opposed the motion on futility grounds.  *Doc. 120-122*.  Defendants also

---

[1] Throughout this Opinion and Order, the singular form of "Plaintiff" will refer to Plaintiff Rick Seeberger.

[2] Defendants are organized into three groups, each represented by different counsel: (1) DASO, (2) County, and (3) Media.  The DASO Defendants consist of Defendants Lerma, Long, and Kinney.  The County Defendants consist of Defendants Brown, Weir, Caldwell, Medeiros, Noland, Garret of the Board, and Hancock.  The Media Defendants consist of Defendants Goodman and MNG.

request that the Court grant their Motions to Dismiss Plaintiffs' Original Complaint.
*Docs. 13, 16, 32, & 89.*

Because the motion for leave to file an amended complaint is opposed on futility grounds, both it and the motions to dismiss hinge on the same question – are Plaintiffs' allegations sufficient to state claims under Fed. R. Civ. P. 8 and 12.  Plaintiffs' proposed Amended Complaint incorporates by reference all of the factual allegations contained in the Original Complaint and adds some new factual allegations.  *Doc. 119* at 5 ("Plaintiffs reallege and incorporate by reference each of the facts and allegations asserted in ¶¶ 17 through 34" of their Original Complaint, which includes the entire "Factual Background" section of that Complaint).  Moreover, it raises substantially all of the claims raised in the Original Complaint.  Therefore, the Court will review the sufficiency of all Plaintiffs claims based on the allegations contained the operative Complaint and the proposed Amended Complaint.  If Plaintiffs' claims are insufficient, even as augmented by the proposed Amended Complaint, the motions to dismiss would be well taken and the motion for leave to file Amended Complaint would be futile.  Finally, the Court will address Plaintiffs' assertions that several Defendants are in default.

## II.   FACTUAL ALLEGATIONS

### A.  Scope of Allegations Considered

At the outset, because the Amended Complaint seeks to draw from sources outside of the document itself, the Court must consider the scope of the factual allegations to be construed as part of Plaintiffs' Amended Complaint.  Under Federal Rule of Civil Procedure 10, "[a] statement in a *pleading* may be adopted by reference elsewhere . . . in any other pleading or motion."  FED. R. CIV. P. 10(c) (emphasis added); *see also* FED. R. CIV. P. 10(b) ("A later pleading may refer by number to a paragraph in an earlier pleading").  Plaintiffs seek to incorporate by reference the entire fact section of their Original Complaint into their Amended Complaint.  *Doc. 119* at 4.  In light of Rule 10(c), and given the Court's mandate to liberally construe *pro se* pleadings, *Casanova v. Ulibarri*, 595 F.3d 1120, 1125 (10th Cir. 2010), the Court will consider the entire fact section in the Original Complaint in conjunction with facts pleaded in the Amended Complaint.  *Cf. Clayton v. ConocoPhillips Co.*, 722 F.3d 279, 300 (5th Cir. 2013) (incorporating by reference entire background and jurisdictional information in earlier complaint insufficient to provide notice of breach of contract claim).  Similarly, because "[a] copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes," FED. R. CIV. P. 10(c), and all of the exhibits attached to Plaintiffs' Original Complaint are referenced in the portions incorporated into the Amended Complaint, *see doc. 1*, Ex. A-1 at 6, 9, 13, 14, & 18, the Court will also consider the

4

exhibits attached to both of Plaintiffs' Complaints.  *Cf. Galloway v. City of Abbeville*, 871 F. Supp. 1298, 1304-05 (M.D. Ala. July 02, 2012) (refusing to consider exhibits attached to an abandoned pleading because plaintiff could have attached the same exhibits to his amended pleading).

The Federal Rules, however, do not provide for incorporating non-pleadings into a complaint, as Plaintiffs attempt to do here.  Pleadings typically consist of complaints and answers, but do not include motions, responses, or replies.  FED. R. CIV. P. 7(a)-(b) (creating as distinct categories (a) pleadings and (b) motions and other papers); *see also Black's Law Dictionary* (10th ed. 2014) (defining "pleading" as "[a] formal document in which a party to a legal proceeding (esp. a civil lawsuit) sets forth or responds to allegations, claims, denials, or defenses.  In federal civil procedure, the main pleadings are the plaintiff's complaint and the defendant's answer.").  Accordingly, the Court will not consider the portions of the non-pleadings referenced in Plaintiffs' Amended Complaint.  *See, e.g., doc. 119* at 11 (incorporating "¶¶ 1 through 19 of *Plaintiffs' Amended Response and Opposed Motion to Strike Defendant MNG's Motion to Dismiss Claims*") (emphasis in original), 17 (incorporating ¶¶ 1 through 49 of *Plaintiffs' Response and Objection to Defendant DAC Parties I Motion to Dismiss Claims and Memorandum in Support*") (emphasis in original).  "After all, even liberal notice pleading still requires at least some pleading."  *Clayton*, 722 F.3d at 300 (emphasis omitted).  And, the Court is of the opinion that collating the litany of documents referenced by Plaintiff in order to

ascertain the viability of his claims would be more akin to "assum[ing] the role of advocate for the pro se litigant," *Baker v. Holt*, 498 F. App'x 770, 772 (10th Cir. 2012) (unpublished), which is improper, than liberally construing pleading, which is not.

In short, the balance struck by the Court is to consider the facts pleaded in the Original Complaint that were incorporated into the Amended Complaint, as well as the exhibits attached to both Complaints, but not the portions of non-pleadings Plaintiffs attempt to incorporate.

### B.  General Factual Allegations

On February 7, 2013, Build a Strong Future, "a 100% woman-owned socially conscious proprietorship" founded by Plaintiff's wife, Plaintiff Susan Seeberger, entered into "a professional services contract" with DASO under which Plaintiff Rick Seeberger was to serve as "the lead provider" of "consulting, training, and coaching services to [DASO]." *Doc. 1*, Ex. A-1 at 12.  Among other things, Plaintiff was to "[c]onduct[] a Strategic Leadership Course wherein a strategic plan for DASO utilizing a proprietary system known as PRIMEGPS would be created." *Id.*  Between May 2013 and January 2014, Build a Strong Future was awarded additional "professional services contracts [task orders]." *Id.* (brackets in original).  The "contracts [task orders] were to advance the processes initiated with the first professional services contract," with Plaintiff Rick Seeberger again serving as a "key person to deliver the service . . . ." *Id.*  (brackets in original).

6

On February 24, 2014, Plaintiff was hired as Sheriff Todd Garrison's Chief of Staff. *Id.* The position had a defined end date of December 31, 2014, but Defendant Brown terminated Plaintiff on August 29, 2014. *Id.* at 21. Plaintiff alleges various wrongdoings by each set of Defendants—(1) County, (2) DASO, and (3) Media—during his time with DASO.

In their Original Complaint, Plaintiffs' First Cause of Action alleges violations of Plaintiffs' civil rights by all Defendants. Specifically, Plaintiffs bring claims pursuant to Art. II §§ 13 and 18 of the New Mexico Constitution, the Fourteenth Amendment of the United States Constitution, and Title VII of the Civil Rights Act of 1964. *Id.* at 23-24. The Second Cause of Action brings claims for breach of contract, breach of duty of good faith and fair dealing, and wrongful discharge. *Id.* at 25-26. The Third Cause of Action alleges malfeasance and common law fraud. The fourth and final section raises tort claims under the New Mexico Tort Claims Act, N.M. STAT. ANN. §§ 41-4-1, 41-4-4 (2001). The Amended Complaint raises the same claims as the Original Complaint with two exceptions: the Amended Complaint (1) omits Plaintiffs' cruel and unusual punishment claim,[3] and (2) adds a Federal Whistle Blower Act claim.[4]

---

[3] The Preliminary Statement section of Plaintiffs' Amended Complaint notes that they are bringing a cruel and unusual punishment claim under the New Mexico Constitution, but the sections outlining Plaintiffs' causes of action do not list this claim. *Doc. 119* at 3, 23-34. Whether it is part of the Amended Complaint or not is immaterial given that, the claim is without merit in both the Original and Amended Complaints for the reasons set forth herein.

[4] Since Plaintiffs voluntarily dismissed their individual capacity claims against the County Defendants in their Original Complaint, *doc. 104*, both Complaints are against these Defendants in their official capacities only, *doc. 119* at 5.

The Court addresses each set of Defendants separately.  Factual allegations specific to each set of Defendants are discussed in greater detail in their respective sections.  Unless otherwise indicated, factual allegations in the Original and Amended Complaints are considered in conjunction.

### III.   STANDARD OF REVIEW

Where, as here, a party is proceeding *pro se*, the court is to liberally construe his pleadings.  *Casanova*, 595 F.3d at 1125.  "But the court [is] not [to] 'assume the role of advocate for the pro se litigant.'"  *Baker*, 498 F. App'x at 772 (quoting *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir.1991)).  In other words, "[t]he broad reading of the plaintiff's complaint does not relieve the plaintiff of the burden of alleging sufficient facts on which a recognized legal claim could be based."  *Hall*, 935 F.2d at 1110.

In ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, the court should accept only the well-pleaded factual allegations as true, viewing them in the light most favorable to the plaintiff.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *Casanova*, 595 F.3d at 1125. "[P]leadings that . . . are no more than conclusions[] are not entitled to the assumption of truth."  *Iqbal*, 556 U.S. at 679.  Thus, the court need only accept allegations "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678. Following these principles, the court considers whether the facts "plausibly give rise to

an entitlement to relief." *Barrett v. Orman*, 373 F. App'x 823, 825 (10th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 677-78).[5]

With respect to the motion for leave to amend, such leave is to be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2).[6] The "decision to grant leave to amend a complaint . . . is within the trial court's discretion," *Pallottino v. City of Rio Rancho*, 31 F.3d 1023, 1027 (10th Cir. 1994), but "district courts may withhold leave to amend only for reasons such as 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of [the] amendment.'" *United States v. Lockheed Martin Corp.*, 558 F.3d 1161, 1166 (10th Cir. 2009) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

"A court properly may deny a motion for leave to amend as futile when the proposed amended complaint would be subject to dismissal for any reason," such as for failure to state a claim. *Bauchman for Bauchman v. W. High School*, 132 F.3d 542, 562 (10th Cir. 1997). To avoid a finding of futility, therefore, the amended complaint must meet the 12(b)(6) standard described above.

---

[5] This standard applies to all of Plaintiffs' claims with one exception: Plaintiffs' Title VII claims are addressed pursuant to Federal Rule of Civil Procedure 12(b)(1), which is set forth in the sections addressing those claims.

[6] Plaintiffs are beyond the time frame for amending as of right under Rule 15(a)(1).

## IV.    COUNTY DEFENDANTS

The County Defendants consist of Defendants Brown (County Manager), Weir (Human Resources Director), Caldwell (County Attorney), Medeiros (Deputy County Attorney), Noland (Finance Director), Garret (Chairman of the Board of County Commissioners), and Hancock (Vice Chairman of the Board).  Against these Defendants Plaintiffs' Complaints assert various state tort and constitutional claims, a breach of contract claim, a Title VII discrimination claim, and a Federal Whistleblower Act claim. Plaintiffs' claims primarily stem from his allegedly unlawful termination as DASO Chief of Staff.

### A.  Factual Allegations

Plaintiff was hired in February 2014 as DASO Chief of Staff.  The position had an established end date of December 2014, but Plaintiff was terminated in August 2014. The circumstances surrounding the creation of the position, and Plaintiff's employment and termination therefrom are as follows.

On February 7, 2014, an Inter-Departmental Memorandum was sent to Defendant Brown from Doris White, the Human Resources Manager, regarding Sheriff Garrison's request to create the position of DASO Chief of Staff. *Doc. 119*, Ex. C at 1.  On February 12, 2014, Defendant Brown gave her approval to establish "a temporary position of DASO Chief of Staff."  *Id.*  Also on February 12, 2014, a "Human Resources Action Request" form was completed on behalf of Sheriff Garrison requesting to hire

10

Plaintiff into the position of "DASO Chief of Staff T.E." *Doc. 1*, Ex. H.  The form indicated that the position was a temporary, "unclassified" position. *Id.*  The comments section indicated, "Temporary hire, not to exceed December 31, 2014 or as funding will allow." *Id.*  The form was signed by Defendant Weir and signed on behalf of Sheriff Garrison and on behalf of Defendant Brown. *Id.*

On February 21, 2014, Patti Hammes, a Human Resources Administrator, wrote a letter extending an offer of employment to Plaintiff.  It explicitly noted, "This is a temporary position and is not eligible for benefits." *Doc. 1*, Ex. G.  It further explained, "As a temporary employee, you have no guarantee of continuous employment beyond December 31, 2014, or as funding will allow." *Id.*  Plaintiff signed the letter on February 24, 2014, indicating that he was accepting the position. *Id.*

Plaintiff was ultimately terminated by Defendant Brown on August 29, 2014. He asserts that "[d]espite the technical aspect of the word 'temporary' contained in the Letter offering Plaintiff Seeberger employment with DASO, all parties knew and agreed that temporary meant 'to end on December 31, 2014.'" *Doc. 119* at 12.  Plaintiff asserts that "[t]he engagement letter and the Doña Ana County Human Resources Policies and Procedures Section IV clearly identified Plaintiff Seeberger as both a temporary and unclassified employee with a specified end date for employment.  This created an obligation between employer and employee to fulfill the engagement as an implied contract." *Doc. 1*, Ex. A-1 at 25.   Standing alone, this language appears to claim a

complete guarantee of employment until December 31, 2014.  However, Plaintiff also concedes that he was an at-will employee.  *Doc. 119* at 12*; see also doc. 125* at 9 ("Sheriff Garrison specifically requested Plaintiff Seeberger to be hired and to serve 'at will' **to him** as an elected official to carry out work assignments he ordered . . . .").  A further review of Plaintiffs' allegations and arguments allows the Court to reconcile this inconsistency.  Plaintiffs repeatedly emphasize that Plaintiff was an at-will employee to the Sheriff, not Defendant Brown or any of the other County Defendants.  *Doc. 119* at 12 ("Defendant Julia Brown approved [of the Chief of Staff Position] . . . knowing that Sheriff Garrison desired to fill this position with a key person working 'at will' for the Sheriff under a contract between Doña Ana County ('DAC')/Doña County Sheriff's Office ('DASO') and Plaintiff Rick Seeberger"); *see also doc. 125* at 9 ("Sheriff Garrison specifically requested Plaintiff Seeberger to be hired and to serve 'at will' **to him** as an elected official to carry out work assignments he ordered . . . .") (emphasis in original).  Consequently, the Court construes Plaintiffs' position to be that, unless the Sheriff decided otherwise, Plaintiff would remain employed until at least December 31, 2014.

Plaintiffs allege that on August 29, 2014, Defendant Brown wrongfully terminated "Plaintiff's employment as DASO's Chief of Staff . . . without approval from Sheriff Garrison."  *Doc. 119* at 23.  Moreover, Plaintiffs allege, Defendant Brown terminated Plaintiff notwithstanding a provision in Defendant Brown's employment agreement that reads: "The Board of County Commissioners stipulate that the County

Manager has authority over the County's workers, excluding work assignments for employees in the department[] managed by the Sheriff . . ." *Id.* at 13.

Defendants Brown and Weir asked Sheriff Garrison to sign a form concurring in Plaintiff's termination but Sheriff Garrison refused to do so. *Id.* at 13. Sheriff Garrison stated that he found "insufficient reason to terminate Mr. Seeberger's employment and any effort to do so without cause would violate the spirit and letter of the agreement to employ Mr. Seeberger through the end of my term." *Id.*

In conjunction with Plaintiff's termination, he alleges that Defendants Brown, Caldwell, and Weir (1) wrongfully permitted "outside investigations of complaints to exceed the deadlines set forth in County Policies and then proceeded to combine matters together to create a determination based on *circumstantial* evidence rather than factual evidence," (2) relied on testimony that was protected by the attorney client privilege and was work product, (3) did not afford Plaintiff "the opportunity to have access to his own testimony" referenced in Defendant Weir's Determination Letter, *doc. 1*, Ex. A-1 at 22, and (4) did not act in accordance with Doña Ana County Human Resources Policies and Procedures, *doc. 119* at 14. Plaintiff further alleges that he was terminated to cover up the "negligence and tortious behavior" of Defendants Brown, Caldwell, and Weir and that his termination "was carried out with the motive of retaliating against the Sheriff for the work being carried out by Plaintiff Rick Seeberger." *Doc. 1*, Ex. A-1 at 21.

13

Plaintiff alleges other wrongdoings by the County Defendants as well.  As part of his duties, Plaintiff conducted several budgetary analyses and made a presentation to the County Defendants where he "cautioned them on the oversights and misrepresentations being made within the budget." *Doc. 119* at 28.  Plaintiff alleges that the County Defendants retaliated against him for it.  He also alleges that they were advised of the "malfeasance being committed" by the DASO Defendants, but that they "did nothing to discipline or hold these individuals accountable." *Id.*

### B.  State Constitutional and Tort Claims

The County Defendants are immune from suit for the state constitutional and tort claims raised by Plaintiffs.  In pertinent part, under the New Mexico Tort Claims Act (NMTCA or TCA), "A governmental entity and any public employee while acting within the scope of duty are granted immunity from liability for any tort except as waived by . . . Sections 41-4-5 through 41-4-12 NMSA 1978."  N.M. STAT. ANN. § 41-4-4(A) (2001).  The NMTCA also applies to damages claims for alleged violations of the New Mexico Constitution.  *Lymon v. Aramark Corp.*, 728 F. Supp. 2d 1222, 1251 (D. N.M. July 7, 2010) (unpublished) (citing, *inter alia*, *Barreras v. N.M. Corr. Dep't*, 62 P.3d 770, 776 (N.M. Ct. App. 2003)).  Plaintiffs' Complaints assert several tort and state constitutional claims against the County Defendants.[7]  In order to pursue these claims, Plaintiffs were

---

[7] Plaintiffs also list "malfeasance" as a claim against multiple Defendants, but Plaintiff lacks standing to bring this claim.  N.M. STAT. ANN. § 3-10-7 (1965) ("Any person elected or appointed to an elective office

required to plead sufficient facts to demonstrate that the County Defendants are not

entitled to immunity by showing either (1) that a Defendant acted outside the scope of

his or her duty, or (2) that the NMTCA specifically waives immunity for the claim

asserted.  They have failed to do so.

### 1.   *The County Defendants acted within the scope of their duties*

In determining scope of duty, courts look to whether "there was a connection

between the public employee's actions at the time of the incident and the duties the

public employee was requested, required or authorized to perform."  *Seeds v. Lucero*,

113 P.3d 859 (quoting *Celaya v. Hall*, 85 P.3d 239, 246 (N.M. Ct. App. 2004)); *see also* N.M.

STAT. ANN. § 41-4-3(G) (2013) (defining scope of duty as "performing any duties that a

public employee is requested, required or authorized to perform by the governmental

entity, regardless of the time and place of performance.").  Actions may be related or

incidental to an employee's duties even if they are tortious or criminal.  *Celaya*, 85 P.3d

at 246 ("[T]he TCA clearly contemplates including employees who abuse their officially

authorized duties, even to the extent of some tortious and criminal activity"); *Seeds*, 113

P.3d at 862 ("Our case law establishes that a public employee may be within the scope

of authorized *duty* even if the employee's *acts* are fraudulent, intentionally malicious, or

even criminal") (emphasis in original).  As the New Mexico Court of Appeals explained:

---

of a municipality may be removed for malfeasance by the district court upon complaint of the mayor or
governing body of the municipality.").

> [T]he legislature likely foresaw the possibility that a public employee could abuse the *duties* actually requested, required or authorized by his state employer and thereby commit malicious, even criminal *acts* that were unauthorized, yet incidental to the performance of those duties. And it is equally likely that the legislature intended that those unauthorized acts would fall within the scope of duties as defined in the TCA.

*Risk Mgmt. Div. v. McBrayer*, 14 P.3d 43, 48 (N.M. Ct. App. 2000) (emphasis in original). Similarly, allegations of wrongful motive are "simply irrelevant," as long as the action falls within the scope of duty. *Seeds*, 113 P.3d at 862.

Plaintiff avers that the County Defendants (1) retaliated against him by wrongfully terminating him, (2) failed to discipline the DASO Defendants, and (3) made misrepresentations in the County budget. For the following reasons, the Court finds that these actions were all within the scope of duty of the relevant County Defendant, who include commissioners, attorneys, a human resources director, a financial director, and the manager of the County. Defendant Brown in particular acted within the scope of her duties as County Manager for the actions about which Plaintiffs complain. Therefore, the County Defendants are immune to such claims barring a waiver under the NMTCA.

Under New Mexico law, "The powers of a county as a body politic and corporate shall be exercised by a board of county commissioners." N.M. STAT. ANN. § 4-38-1 (1953). The Board, in turn, "may employ and set the salary of a county manager to conduct the business of the county, to serve as personnel officer, fiscal director, budget

officer, property custodian and to act generally as the administrative assistant to the

board, aiding and assisting it in the exercise of its duties and responsibilities." *Id.*

The Doña Ana County Board of County Commissioners has vested such

authority in a County Manager.  Under County Ordinance § 45-10(A)-(B)(1), "The

County Manager is the Chief Executive Officer of County Government . . . [and] is

charged with: (1) the *exclusive authority to employ and discharge all County employees*

pursuant to this chapter and the Human Resources Policies adopted pursuant to this

chapter."  DOÑA ANA COUNTY, NM, ORDINANCE § 45-10(A)-(B)(1) (2008),

http://ecode360.com/9673751 (emphasis added) (hereinafter "County Ordinance").[8]

Consistent with this arrangement, Sheriff Garrison had to request that the Chief of Staff

position be created, which was then researched by the Human Resources Department

and signed off on by Defendant Brown.  Thus, not only does the County Ordinance

indicate that Defendant Brown retained authority over Plaintiff's employment, the

circumstances do as well.  Consequently, Defendant Brown acted within the scope of

her duties in terminating Plaintiff.

Plaintiffs' allegations and assertions to the contrary are ineffectual.  Plaintiff Rick

Seeberger's allegations that Defendant Brown and the County Defendants retaliated

against him and were covering up wrongful conduct are immaterial to the question of

---

[8] The Court takes judicial notice of the County's Ordinances.  *Turner v. City of Tulsa*, 525 F. App'x 771, 773 (10th Cir. 2013) ("[A] court may take judicial notice of a city charter without converting a motion to dismiss into a motion for summary judgment") (internal citations and quotation omitted).

scope.  *Seeds*, 113 P.3d at 862 ("[W]rongful motive is simply irrelevant," so long as the action is within the scope of duty).

Plaintiff's reliance on Defendant Brown's employment agreement is also unavailing.  By County Ordinance, Defendant Brown unequivocally retained the authority to discharge county employees, such as Plaintiff, notwithstanding any contractual agreements attempting to constrain that authority.  County Ordinance § 45-7(D) ("The specific terms and conditions of a classified or unclassified employee's employment are governed first by this chapter, and then by either the express terms of the Human Resources Policies adopted pursuant to this chapter, or by the terms of any employment contract."); *cf. Risk Mgmt. Div. v. McBrayer*, 14 P.3d at 50 ("The standard governing the state's obligations to its employees is dictated by statutory law, which does not necessarily yield to secondary agreements or contracts created by state agencies.").

Further still, Plaintiff's reliance on his offer of employment is likewise unpersuasive.  As will be discussed in greater detail below, Plaintiff's employment agreement does not appear to have been breached because employees in unclassified positions, such as Plaintiff, "are in an 'at-will' status and serve at the pleasure of the County."  County Ordinance § 45-7.  Moreover, Defendant Brown could have terminated Plaintiff – even if it meant breaching Plaintiff's employment contract — and nevertheless remained within the scope of her duties as County Manager.  *See Seeds*, 113

P.3d 859, 862 (N.M. Ct. App. 2005) ("Our case law establishes that a public employee may be within the scope of authorized *duty* even if the employee's *acts* are fraudulent, intentionally malicious, or even criminal") (emphasis in original).

Finally, Defendant Brown did not need the Sheriff's approval to terminate Plaintiff.   County Ordinances place the County Manager in a position above the Sheriff with respect to personnel decisions.  Again, the County Manager is vested with the "authority to employ and discharge all County employees."  County Ordinance § 45-10. And, the above provision is "binding on the operations of . . . other County departments relating to hiring, promotion, discharge, and general human resources management." County Ordinance § 45-4.  Further still, "Elected officials," such as the Sheriff, "are authorized to promulgate operational policies and procedures specific to their department functions, *subject to the review and approval by the County Manager*, and *provided such policies and procedures do not conflict with the terms of this chapter* or the Human Resources Policies."  County Ordinance § 45-8(C) (emphasis added).  This arrangement is consistent with the limitation in Defendant Brown's employment agreement prohibiting her from interfering with the "work assignments" of those working for the Sheriff.  *Doc. 119* at 13.  However, for the reasons stated above it did not divest Defendant Brown of her authority to terminate Plaintiff.

The reasoning above buttresses the common sense conclusion that one individual does not terminate another unless he or she has the authority to do so.  Given the broad

and clear authority of Defendant Brown over Plaintiff's employment, the Court

concludes that, as a matter of law, Defendant Brown acted within the scope of her duty

in terminating Plaintiff.

The above analysis applies with equal force to Plaintiff's complaints about

budgetary and personnel matters.  The Court finds that such matters would have fallen

within the purview of Defendant Brown's authority as the "Chief Executive Officer of

County Government," County Ordinance § 45-10(A)-(B)(1), or, alternatively, within the

purview of authority of one of the other County Defendants, such as Defendants Weir

as Human Resources Director, or Defendant Noland as Finance Director.  County

Ordinance § 45-6 ("Under the supervision of the County Manager, the Human

Resources Director will administer the Doña Ana County Merit System set forth in this

chapter, consistent with the Human Resources Policies to be adopted in accordance

herewith, and in accordance with all future approved directives and administrative

instructions").

### 2.   *The County Defendants are immune from suit under the NMTCA*

Having established that the County Defendants acted within the scope of their

duties, the next question is whether immunity has been waived for any of the torts or

state constitutional claims alleged by Plaintiff.  *Lymon*, 728 F. Supp. 2d at 1251

(unpublished) (citing, *inter alia*, *Begay v. State*, 723 P.2d 252, 255 (N.M. Ct. App. 1985);

*Barreras v. N.M. Corr. Dep't*, 62 P.3d 770, 776 (N.M. Ct. App. 2003)).  Plaintiffs'

Complaints assert the following tort and state constitutional claims against the County Defendants: (1) cruel and usual punishment; (2) due process violations; (3) wrongful discharge,[9] (4) common law fraud, and (5) defamation.[10]  "If no specific waiver of immunity can be found in the Tort Claims Act, plaintiffs' complaint must be dismissed."  *Pemberton v. Cordova*, 734 P.2d 254, 256 (N.M. Ct. App. 1987).

The first seven sections of the NMTCA waive immunity for various torts but are inapplicable to the allegations against the County Defendants.[11]  The eighth and final section waives immunity for some of the torts and constitutional claims listed in Plaintiffs' complaint but only as to law enforcement officers, which the County Defendants are not.

A law enforcement officer is defined as "a full-time salaried public employee of a governmental entity . . . whose principal duties under law are to hold in custody any person accused of a criminal offense, to maintain public order or to make arrests for crimes . . . ."  N.M. STAT. ANN. § 41-4-3.  "New Mexico courts have construed this

---

[9] Plaintiff groups his breach of contract claim and wrongful discharge claim under the same section and does not list wrongful discharge in his tort claims section, but "[a]n action for retaliatory discharge, . . . lies not as a breach of contract, but as a tort."  *Hartbarger v. Frank Paxton Co.*, 857 P.2d 776, 782 n. 5 (N.M. 1993).

[10] The County Defendants generously read other torts into Plaintiffs' Complaints only to assert that they too are not exempted by the NMTCA.  Thus, the Court excludes them here.

[11] *See* N.M. STAT. ANN. § 41-4-5 (pertaining to liability caused by negligent operation or maintenance of motor vehicles, aircraft or watercraft), § 41-4-6 (buildings and other property), § 41-4-7 (airports), §41-4-8 (public utilities), § 41-4-9 (medical facilities), § 41-4-10 (health care providers), and § 41-4-11 (highways and streets).

definition strictly." *Williams v. Board of Regents of University of New Mexico*, 20 F.Supp.3d 1177, 1190 (D.N.M. April 29, 2014) (J. Browning) (citation omitted).

Courts "look at the character of the principal duties involved, those duties to which employees devote the majority of their time," in making this determination. *Anchondo v. Corrections Dep't*, 666 P.2d 1255, 1257 (N.M. 1983). "In cases where primary job duties do not encompass the arrest and detention of accused persons, the courts have generally exempted the positions from inclusion in the law enforcement officer exception of the NMTCA." *Limacher v. Spivey*, 198 P.3d 370, 374 (N.M. Ct. App. 2008); *see also Williams*, 20 F. Supp. 3d at 1190 (collecting cases). Plaintiff does not allege any facts suggesting that the County Defendants – who are County commissioners, attorneys, human resources officials, or financial officers — are law enforcement officers. Therefore, immunity for Plaintiffs' tort claims has not been waived.

In sum, the County Defendants acted within the scope of their duties with respect to the allegations levied against them. They are, therefore, entitled to immunity from suit for any tort or state constitutional claim unless immunity is waived under the NMTCA. Because none of the state tort or constitutional claims listed by Plaintiff are ones for which immunity has been waived, Plaintiffs fail to state a plausible claim against the County Defendants for (1) cruel and usual punishment; (2) due process violations; (3) wrongful discharge, (4) common law fraud, and (5) defamation.

### C.  Breach of Contract  and Good Faith & Fair Dealing Claims

Plaintiffs also fail to state a claim against the County Defendants for breach of contract.  "The elements of a breach-of-contract action are the existence of a contract, breach of the contract, causation, and damages."  *Abreau v. New Mexico Children, Youth and Families Dep't*, 797 F. Supp. 2d 1199, 1247 (D.N.M. June 16, 2011) (citing *Camino Real Mobile Home Park P'ship v. Wolfe*, 891 P.2d 1190, 1196 (1995)).

Here, a valid, written contract existed.  The February 21, 2014 Letter ("Letter") was addressed to Mr. Seeberger and stated, "We are pleased to extend an offer of employment as Chief of Staff with the Sheriff's Department of Doña Ana County."  *Doc. 1*, Ex. G.  The Letter indicated that Plaintiff was to be paid $27.59 an hour for a maximum of 30 hours per week of work.  Plaintiff signed the Letter on February 24, 2014, indicating that he was accepting the position.  *Id.*  Thus, the requirements of a valid contract – offer, acceptance, and consideration – were met.  *Heye v. Am. Golf Corp., Inc.*, 80 P.3d 495, 499 (N.M. Ct. App. 2003) (citations omitted).

Having established that a valid employment contract existed, the next question is whether the terms of the contract permitted Defendant Brown to terminate Plaintiff prior to the specified end date.  As is pertinent here, "[t]he general rule in New Mexico is that an employment contract is for an indefinite period and is terminable at the will of either party unless . . . there is an express contractual provision stating otherwise . . . [or] an implied contract term [] restricts the employer's power to discharge."  *Hartbarger*

*v. Frank Paxton Co.*, 857 P.2d 776, 779 (N.M. 1993).  If an employment relationship is at-will, either party can terminate it "at any time for any reason or no reason, without liability."  *Id.*

Here, the Letter noted, "As a temporary employee, you have no guarantee of continuous employment beyond December 31, 2014, or as funding will allow."  *Doc. 1,* Ex. G.  At places, Plaintiffs allege that this language created a guarantee of employment until at least December 31, 2014.  *Doc. 119* at 12 ("Despite the technical aspect of the word 'temporary' . . . all parties knew and agreed that temporary meant 'to end on December 31, 2014'").  However, Plaintiff repeatedly concedes that he was an at-will employee.  *Doc. 119* at 12 ("Defendant Julia Brown approved this position . . . knowing that Sheriff Garrison desired to fill this position with a key person working 'at will' for the Sheriff under a contract between Dona Ana County . . . and Plaintiff Rick Seeberger"); *id.* ("[T]he Chief of Staff Position was to serve 'at will' to the Sheriff . . ."); *see also doc. 125* at 9 ("Sheriff Garrison specifically requested Plaintiff Seeberger to be hired and to serve "at will" **to him** . . .") (emphasis in original).  As explained above,[12] the Court construes Plaintiffs' position to be that, unless the Sheriff decided otherwise, Plaintiff would remain employed until at least December 31, 2014.  Because of this, Plaintiffs argue, Defendant Brown's employment agreement with the Board of County Commissioners, which limited her ability to interfere with work assignments from the

---

[12] *See supra* pp. 10-11.

Sheriff, precluded her from terminating Plaintiff prior to December 31, 2014.  Thus, the

real issue, as to breach of contract, is not whether Plaintiff could be terminated prior to

December 31, 2014, but by whom.

The Court has already largely addressed this question in its discussion on

Defendant Brown's scope of duty.  As a matter of law, Defendant Brown was vested

with "[t]he exclusive authority to employ and discharge all County employees . . . ."

County Ordinance § 45-10.  Additionally, Plaintiff's pleadings establish his status as an

unclassified employee, *doc. 1*, Ex. H,  and, as a matter of law, "[u]nclassified employees

are in an 'at-will' status and serve *at the pleasure of the County*" – not the Sheriff.  County

Ordinance § 45-7 (emphasis added); *see also* N.M. STAT. ANN. § 4-38-1, 19 (1953) (vesting

powers of a county in the board of county commissioners who, in turn, may employ "a

county manager to conduct the business of the county [and] serve as personnel officer . .

."").  Even if Plaintiff could allege facts sufficient to demonstrate his employment

agreement placed him in a position to serve at-will to the Sheriff, the County Ordinance

vesting Defendant Brown with authority over personnel matters would render such an

agreement null and void.  County Ordinance § 45-7(D) ("The specific terms and

conditions of a classified or unclassified employee's employment are governed first by

this chapter, and then by either the express terms of the Human Resources Policies

adopted pursuant to this chapter, or by the terms of any employment contract.").

In sum, Plaintiff's allegations establish that he was to serve as an at-will employee to the County, exercising its authority through a Board of County Commissioners, which, in turn, had vested power over employment decisions in Defendant Brown as County Manager.  Despite the fact that Plaintiff's work assignments came from the Sheriff, his allegations fail to present a plausible claim that his termination by Defendant Brown constituted a breach of his employment agreement.

Plaintiffs' allegations can also be read as asserting that "implied contract" existed, entitling him to employment through December 31, 2014.  Plaintiff alleges that, "[d]espite the technical aspect of the word 'temporary' contained in the Letter . . . all parites knew and agreed that temporary meant 'to end on December 31, 2014.'"  *Doc. 119* at 12.

These allegations can be read one of two ways.  Neither advances Plaintiff's position.  First, to the extent Plaintiff is asserting that the parties had reached an understanding under the terms of the Letter in which he could not be terminated prior to the set termination date, his claim fails because such an understanding is trumped by the written terms of the agreement.  *Trujillo v. Gonzales*, 747 P.2d 915, 917 (1987) (holding county immune from suit based on oral representations that contradicted employment agreements terms).  Second, to the extent Plaintiff is asserting that a separate agreement was orally entered into, his claim would be barred by New

Mexico's grant of immunity for unwritten contracts.  N.M. STAT. ANN. § 37-1-23(A)

(1976) ("Governmental entities are granted immunity from actions based on contract,

except actions based on a valid written contract.").

Because Plaintiff's factual allegations establish that he served as an at-will

employee and because County Ordinances vest Defendant Brown with the authority to

terminate Plaintiff, Plaintiff has failed to state a plausible breach of contract claim.

Plaintiff's attempt to rebut his at-will employment status through allegations of extra-

contractual understandings and communications are inconsequential because they are

inconsistent with the written terms of the agreement and County Ordinances, and the

County is immune from suit for unwritten contracts.  Finally, given his at-will status,

Plaintiff's implied covenant of good faith and fair dealing claim fails as well.  *Melnick v.*

*State Farm Mut. Auto. Ins. Co.*, 749 P.2d 1105, 1109 (N.M. 1988)  ("[W]e do not recognize

a cause of action for breach of an implied covenant of good faith and fair dealing in an

at-will employment relationship.").

### D.  Due Process

Plaintiffs bring suit under 42 U.S.C. § 1983 for alleged Fourteenth Amendment

Due Process violations against all of the County Defendants in their official capacities

only.  "A section 1983 suit against a municipality and a suit against a municipal official

acting in his or her official capacity are the same."  *Myers v. Oklahoma Cnty. Bd. of Cnty.*

*Cmm'rs*, 151 F.3d 1313, 1316 n. 2 (10th Cir. 1998) (internal quotation marks and brackets

omitted).  Thus, Plaintiff's claims against the County Defendants in their official capacities are equivalent to a claim against the County itself.  Municipal liability may be based on (1) an express municipal policy, such as an ordinance, regulation, or policy statement; (2) a "widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage' with the force of law," *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-68 (1970)); or (3) the decision of a person with "final policymaking authority," *Id.* at 123.  There must be a sufficient "causal connection" between the enforcement of the municipal policy or practice and the violation of the plaintiff's federally protected right.  A municipality may be held liable under §1983 only when the enforcement of the municipal policy or practice was the "moving force" behind the violation of the plaintiff's federally protected right.  *Bd. of Cnty. Cmm'rs, Okl. v. Brown*, 520 U.S. 397, 400 (1997). As should be apparent, without an underlying constitutional violation, no cause of action exists against the governmental entity.  *Jicarilla Apache Nation v. Rio Arriba Cnty.*, 376 F.Supp.25 1096, 1099 (citing, *inter alia*, *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993)).  Thus, the first question is whether Plaintiffs' due process rights were violated.

To sustain a due process clause claim, the plaintiff must first demonstrate that he was deprived of a protected interest and then demonstrate that the process attendant to that deprivation was inadequate.  *See Swarthout v. Cooke*, 131 S. Ct. 859, 861 (2011).  "To

have a property interest in a benefit, a person clearly must have more than an abstract need or desire and more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it.  Such entitlements are . . . not created by the Constitution.  Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (internal citations omitted).  Two potentially protected interests at issue here are Plaintiff's employment with the County and Plaintiffs' reputations.

Plaintiff, however, did not have a protected property interest.  Under New Mexico law, if an employment relationship is at-will, either party can terminate it "at any time for any reason or no reason, without liability."  *Hartbarger*, 857 P.2d at 779.  Thus, Plaintiff's at-will status precluded him from retaining a legitimate claim of entitlement to continued employment.  *Gonzales*, 545 U.S. at 756.  As such, Plaintiff did not have a protected interest.  *See Darr v. Town of Telluride*, 495 F.3d 1243, 1252 (10th Cir. 2007) (citation omitted) ("At-will employees lack a property interest in continued employment.").

Because Plaintiff has not alleged sufficient facts to demonstrate that the County Defendants deprived him of a protected property interest, he has failed to state a plausible Due Process claim against them.

### E.  Federal Whistleblower Act

Plaintiffs inject the following sentence into their Amended Complaint: "[County Defendants] failed to protect Plaintiff Seeberger from internal repercussions of exercising the Federal Whistleblower Act." *Doc. 119* at 31.  However, "[t]he Whistleblower Protection Act of 1989, by its terms, applies only to *federal* employees." *Negron-Santiago v. San Cristboal Hosp.*, 764 F.Supp.2d 366, 370 (D.P.R. February 16, 2011) (emphasis in original) (citations omitted); *see also Alferos v. Office of Pers. Mgmt.*, 20 F.App'x 872,873 (Fed. Cir. 2001).  Thus, Plaintiff, who was not and is not a federal employee, has failed to state a plausible claim under this act.

### F.  Title VII

Finally, Plaintiffs' Title VII claim fails for want of jurisdiction because Plaintiffs failed to exhaust their administrative remedies.  "It is well-established that Title VII requires a plaintiff to exhaust his administrative remedies before filing suit." *Shikles v. Sprint/United Management Co.*, 426 F.3d 1304, 1317 (10th Cir. 2005).  "In the Tenth Circuit, exhaustion of administrative remedies is a jurisdictional prerequisite to suit." *Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1183 (10th Cir. 2007) (internal citations omitted).  As such, exhaustion is addressed under a Rule 12(b)(1), rather than 12(b)(6), standard.  FED. R. CIV. P. 12(b)(1). Motions under 12(b)(1) "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject matter jurisdiction; or (2) a challenge to the actual facts upon which subject matter jurisdiction is based." *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002) (citations omitted).  The Court

reads the County Defendants' Response as mounting a facial attack because they do not

challenge the facts on which Plaintiffs purport to have jurisdiction.  Rather, in asserting

that Plaintiffs have not exhausted their administrative remedies, the County Defendants

rely on the Equal Employment Opportunity Commission (EEOC) charge itself, which is

attached to the Amended Complaint, and the facts in the charge.[13]  *Doc. 120* at 5-6.

Because the Court is addressing the County Defendants' 12(b)(1) argument as a facial

attack, the Court "presume[s] all of the allegations contained in the amended complaint

to be true."  *Ruiz*, 299 F.3d at 1180.  Finally, because the "jurisdictional issues . . . are

[not] intertwined with the case's merits," the Court is not required to "resolve the

motion under either rule 12(b)(6) or rule 56."  *Bates v. New Mexico Corr. Dep't*, No. CIV

08-1013 JB/RLP, 2010 WL 4339367, at *6 (D.N.M. Sept. 30, 2010) (unpublished).

The exhaustion analysis proceeds in two steps.  Step one consists of determining

whether a charge of discrimination was filed with the EEOC.  *Jones*, 502 F.3d at 1183.

Step two requires examining "the scope of the allegations raised in the EEOC charge" to

"determin[e] whether administrative remedies have been exhausted as to a particular

claim."  *Id.* at 1186.  Although allegations in an EEOC charge are to be liberally

construed, the Tenth Circuit has stated,

---

[13] Plaintiffs properly attached the EEOC Charge to their complaint under Rule 10(c).  *See E.E.O.C. v. Concentra Health Svcs., Inc.*, 496 F.3d 773, 778 (7th Cir. 2007) (EEOC's "attach[ing] the charge to its complaint . . . would have made the charge part of the pleadings under Fed. R. Civ. P. 10(c)"), *Robinson v. Lake Minnehaha Owner's Ass'n*, No. 2:12–CV–108–TLS, 2012 WL 6197150, *1 n. 1 (N.D. Ind. Dec. 12, 2012) ("The Court can consider the content of the EEOC Charges without converting the Defendant's Motion to a motion for summary judgment because the EEOC Charges are attached to the Complaint and are part of the pleadings.").

> We emphasize . . . that our inquiry is limited to the scope of the administrative investigation that can reasonably be expected to follow from the discriminatory acts alleged in the administrative charge.  In other words, the charge must contain facts concerning the discriminatory and retaliatory actions underlying each claim; this follows form the rule that 'each discrete incident' of alleged discrimination or retaliation 'constitutes its own unlawful employment practice for which administrative remedies must be exhausted.

*Id.*

In determining the scope of an EEOC charge, the checking of a box indicating a particular claim or type of discrimination on an EEOC Charge of Discrimination Form is not dispositive.  *Duncan v. Manager, Dep't of Safety, City & Cnty. Of Denver*, 397 F.3d 1300, 1314 (10th Cir. 2005) (finding plaintiff did not exhaust where her EEOC charge did not allege facts in support of a retaliation claim even though she checked the box for retaliation).  However, "[t]he failure to mark a particular box creates a presumption that the charging party is not asserting claims represented by that box."  *Jones*, 502 F.3d at 1186 (citing *Gunnel v. Utah Valley State College*, 152 F.3d 1253, 1269 (10th Cir. 1998)).  The presumption may be overcome, "if the text of the charge clearly sets forth the basis of the claim."  *Id.*

Plaintiff did indeed file an EEOC charge and obtained a notice of right to sue.  The issue is whether his present claims, retaliation and religious discrimination, fall within the scope of that charge.  *Doc. 118*, Ex. 1-A.  Plaintiff filed his charge of discrimination on February 18, 2015, against DASO.  *Id.*  The date of the alleged discrimination was August 29, 2014, the date Plaintiff was terminated.  According to the

charge document provided by Plaintiffs, *doc. 118* (Sealed Exhibit 1-A), in the section

regarding the basis for discrimination, the boxes for both retaliation and religion were

checked.[14]

However, in the fact section of that charge after stating the mere fact that he was

terminated, Plaintiff wrote only, "I believe I have been retaliated against based on tasks

assigned by Sheriff Garrison, Ms. Weir and Ms. Brown in violation of Title VII of the

Civil Rights Act of 1964, as amended." *Doc. 118*, Ex. 1-A at 2.  Without question, this

sparse statement could not have reasonably been expected to lead to an investigation

about religious discrimination as no such discrimination is even mentioned.

In fact, these factual allegations are also insufficient to lead to an investigation for

retaliation within the meaning of Title VII.  "Retaliation" is actionable under Title VII

only if the employer retaliated due to the employee's protected opposition to

discrimination.  *See Petersen v. Utah Dep't of Corrections*, 301 F.3d 1182, 1188 (10th Cir.

2002).  Plaintiff's allegations to the EEOC were simply that he was "retaliated against

based on tasks assigned." *Doc. 118*, Ex. 1-A at 2.  He made no assertion, implied or

otherwise, that he had engaged in protected opposition to discrimination, let alone that

it was the basis for the retaliation.  Given this glaring omission, the statement in his

---

[14] The Court notes that, on the Charge document provided by Defendants, only the box for retaliation is checked.  *Doc. 120*, Ex. A, B.  This troubling discrepancy will be addressed pursuant to an order to show cause filed contemporaneously with this Opinion and Order.

EEOC charge could not have reasonably been expected to lead to an investigation about retaliation for some protected activity.[15]

> We emphasize . . . that our inquiry is limited to the scope of the administrative investigation that can reasonably be expected to follow from the discriminatory acts alleged in the administrative charge.  In other words, the charge must contain facts concerning the discriminatory and retaliatory actions underlying each claim; this follows form the rule that 'each discrete incident' of alleged discrimination or retaliation 'constitutes its own unlawful employment practice for which administrative remedies must be exhausted
>
> Plaintiffs' Complaints claim discrimination on the basis of religion and retaliation under Title VII.  However, the charge he filed with the EEOC did not "contain facts concerning the discriminatory and retaliatory actions underlying each claim," such that these claims could be considered within the scope of the charge.  *Jones*, 502 F.3d at 1186.  Consequently, Plaintiff failed to exhaust his administrative remedies on either claim and they must be dismissed pursuant to Rule 12(b)(1) for lack of jurisdiction.

---

[15] In fact, Plaintiffs fail to allege that Plaintiff engaged in protected opposition to discrimination (or that it was the cause of the alleged retaliation) in either the Complaint or the Proposed Amended Complaint. As such, that claim would be subject to dismissal under Rule 12(b)(6) for failure to state a plausible claim.

## V.     DASO DEFENDANTS

The DASO Defendants consist of Defendants Lerma, Long, and Kinney, each of whom served in high-ranking positions within the Sheriff's Office.  Both of Plaintiffs' Complaints assert claims for state and federal constitutional violations, fraud, and violation of Title VII.

### A.  Factual Allegations

Plaintiffs allege that the DASO Defendants "resist[ed] changes called for in the Strategic Plan . . . and often demonstrated improper behavior in front of the peers and direct reports."  *Doc. 1*, Ex. A-1 at 14.  They further allege that the DASO Defendants took actions "centered on discrediting Plaintiff Seeberger as a person, ruining his reputation, defaming him as a leader, author, coach and consultant, causing pain and suffering, and ultimately the destruction of important and worthwhile community improvement efforts in El Paso, Texas."  *Id.* at 19.

During all times material to this litigation, Defendant Lerma served as either Undersheriff for DASO or Manager of Community and Constituent Services.  *Id.* at 15. Plaintiffs allege that Defendant Lerma, "[a]s supervisor of the Criminal Investigation Division, . . . failed to manage the case workload and permitted over 2,000 active cases to remain open . . ."  *Id*.  Defendant Lerma then attempted to cover up his shortcomings by "fil[ing] a complaint against Plaintiff [] with the Doña County Manager [sic] accusing Plaintiff of retaliating against him."  *Id.*

Plaintiffs allege that Defendant Long, a Captain with DASO, committed fraudulent and retaliatory acts against Plaintiff.  *Id.*  Plaintiff states that it is his "belief that on January 31, 2014 at 4:05:49pm [sic] Defendant Long called in an anonymous complaint to the Doña Ana County Whistle Blower hotline claiming fraud, theft and conflicts of interest involving Sheriff Todd Garrison and Plaintiff Rick Seeberger."  *Doc. 1*, Ex. A-1 at 15-16.

Plaintiffs allege that Defendant Long also "filed an internal EEO complaint for sexual harassment with the Doña Ana County Human Resources Office against Plaintiff Rick Seeberger."  *Id.* at 16.  The "EEO complaint" alleged that "on May 8, 2013 Plaintiff Rick Seeberger placed a hand on his shoulder during a leadership training class."  *Id.*  Plaintiff asserts that the Defendant Long misstated and exaggerated facts in his EEO complaint.  *Id.*

Plaintiff also alleges that Defendant Lerma, "who was familiar with the [EEO] incident and Defendant [Weir] who accepted [Defendant Long's] complaint committed fraudulent acts . . . [,] discriminated against Plaintiff [Rick] Seeberger . . .[, and] failed to adhere to County Policy . . . by not addressing the complaint at the lowest level where the proper facts could be presented."  *Id.* at 16-17.  Plaintiff avers that such conduct was "how the County senior personnel handled personnel and other operational matters ultimately creating a hostile work environment where retaliation could take on many

36

shapes and forms while personal accountability was not upheld as a standard of performance."  *Id.* at 17.

Plaintiffs allege that Defendant Kinney, a Captain with DASO, filed a religious discrimination complaint against Plaintiff Rick Seeberger and Sheriff Garrison in August 2013, that "was later unsubstantiated . . ."  *Id.* at 18.  Plaintiffs allege the complaint was initiated "in retaliation of being expected to fulfill his duties as a Captain and a member of the DASO Command Staff . . ."  *Id.*  Although unsubstantiated, Plaintiffs allege that Defendant Kinney's actions contributed to Defendants Goodman and MNG's misrepresentations about Plaintiff.

### B.  State Tort Claims

As set forth in Section IV.B., *supra*, in order to pursue state tort and constitutional claims against public employees, Plaintiffs must plead sufficient facts to show either (1) that a Defendant acted outside the scope of his or her duty, or (2) if acting within the scope of duty, that the NMTCA specifically waives immunity for the claim asserted.

Plaintiffs' allegations against each of the DASO Defendants pertain to their lodging or handling of complaints against Plaintiff or their work performance generally. Because the complained of conduct all pertained to the DASO Defendants' work performance and filing of work-related complaints against a co-worker, the Court has little trouble concluding that "there [was] a connection between the [DASO Defendants'] actions at the time of the incident and the duties the[y]were requested,

37

required or authorized to perform." *Seeds v. Lucero*, 113 P.3d at 862 (quotations omitted); *see also Henning*, 171 P.3d at 322 (government officials' use of "mechanisms of their employment," i.e., methods for evaluating and improving teacher performance, was within the scope of their duties, irrespective of their allegedly wrongful motives for doing so). Thus, the DASO Defendants acted within the scope of their duties for the conduct alleged to be wrongful by Plaintiff. That they may have done so in bad faith is immaterial. *Seeds*, 113 P.3d at 862 (allegations of wrongful motive are "simply irrelevant," as long as the complained of action falls within the scope of duty).

Since the DASO Defendants acted within the scope of their duties, the next question is whether the NMTCA waives immunity for any of the torts or constitutional claims alleged by Plaintiffs. The NMTCA does not waive immunity for any of the torts claims explicitly raised by Plaintiffs.[16] Thus, the DASO Defendants are immune to those claims, and the claims are subject to dismissal.

Of course, immunity has been waived for "deprivation[s] of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties." N.M. STAT. ANN. § 41-4-12. Consequently, the Court must determine if

---

[16] The County/DASO Defendants read into Plaintiffs' Complaints negligent supervision and training. The Court notes that Plaintiffs fail to allege that claimed negligence caused a subordinate to commit a tort or constitutional violation which would fall within the NMTCA's waiver of immunity. The Court also recognizes potential claims for tortious interference with business relations/contract. Such recognitions are immaterial as none of the above are exempted by the NMTCA. *See e.g., McDermitt v. Corr. Corp. of America*, 814 P.2d 115, 116-17 (N.M. Ct. App. 1991).

Plaintiffs have presented any plausible claims of such constitutional violations by the DASO Defendants.

### C.  State and Federal Constitutional Claims

Plaintiffs assert due process violations under both the state and federal constitutions and a cruel and unusual punishment claim under the New Mexico constitution.  New Mexico has adopted an interstitial approach for claims based on state constitutional provisions that have a federal analog.  *State v. Gomez*, 932 P.2d 1, 7 (N.M. 1997).  Under this approach, "the court asks first whether the right being asserted is protected under the federal constitution.  If it is, then the state constitutional claim is not reached.  If it is not, then the state constitution is examined."  *Id.* (citation omitted).  Additionally, state courts may diverge from federal precedent to provide broader protections under analogous state constitutional provisions for three reasons: "a flawed federal analysis, structural differences between state and federal government, or distinctive state characteristics."  *Id*. (citation omitted).  Accordingly, the Court begins its analysis with the federal constitution.

#### 1.  *Plaintiffs did not retain an interest protected by the Due Process Clause*

Under the Due Process Clause of the United States Constitution, "[a] public employee has a liberty interest in his good name and reputation as they relate to his continued employment," even if employment is at-will.  *McDonald v. Wise*, 769 F.3d 1202, 1212 n. 2 (10th Cir. 2014).  The government deprives an individual of that interest

when: "(1) it makes a statement that impugns the good name, reputation, honor, or integrity of the employee; (2) the statement is false; (2) the statement is made during the course of termination and forecloses other employment opportunities; and (4) the statement is published, in other words disclosed publically." *Id.* (citations, alterations, and emphasis omitted).

Plaintiffs fail to specifically allege, or otherwise point the Court toward, any particular comment by a DASO Defendant which could form the basis of such a claim. In their motion to dismiss, the DASO Defendants address the sole comment they unearthed which was published in connection with Plaintiff's termination and was made by a DASO Defendant.[17]   The comment was made by Defendant Lerma and was published in a Sun-News article in September 2014 which read as follows:

> Seeberger alleged Tuesday that Lerma 'failed to fulfill his duties,' was abruptly transferred by Brown and is overpaid based on the budgeted salary for his new position.  Lerma declined to discuss Seeberger's allegations, saying it was a 'personnel matter.' But, Lerma added, 'I'm not the one that got fired.'

*Doc. 1*, Ex. Q at 1.  While it is debatable that Plaintiff has properly pled this statement as a violation of his liberty interest under the Due Process clause, the Court will analyze it as the DASO Defendants have highlighted it.

---

[17] In the Response (*doc. 67*), Plaintiffs do not dispute that this statement is the only one made by a DASO Defendant which could form the basis of such a Due Process liberty interest claim.  They certainly do not point the Court to any other such statement.

Although this is a published comment made during the course of Plaintiff's termination, Plaintiffs' factual allegations are insufficient to reasonably infer that the above statements are false or that they foreclosed future employment opportunities.  First, Plaintiffs do not assert, and there is no reason to believe, that Defendant Lerma was fired.  Thus, his statement that he was not fired is not a false statement.  Moreover, the implication that Plaintiff was the one fired is also true according to Plaintiffs' allegations.  Because Plaintiff has not alleged that this particular statement is false, Plaintiff has failed to meet the falsity element required to show a deprivation of a liberty interest protected by the due process clause.

Additionally, although Plaintiff alleges damages and loss of prospective business opportunities generally, he has not pleaded facts that could plausibly establish that Defendant Lerma's statement caused that alleged harm.  This is especially true in light of the various articles and a television interview that occurred prior to Plaintiff's termination and that detailed the litany of legal and financial troubles that Plaintiff and his businesses had encountered.  Plaintiffs assert that the El Paso Coalition, which they founded, suffered a serious "reduction in attendance and support," as a result of the Media and DASO Defendants actions.  The allegations regarding this reduction are as follows:

> **Four**.  On February 19, 2014 – 24 community leaders attended the Coalition meeting
> **Five**.  On March 19, 2014 - 32 community leaders attended the Coalition meeting

**Six**.  On April 23, 2014 after [KVIA-TV][18] published its television interview which aired in both the El Paso Texas and in New Mexico areas, only 20 community leaders attended the Coalition meeting.

**Seven**.  Thereafter, on June 25, 2014 only 8 community leaders attended the Coalition meeting

*Doc. 1*, Ex. A-1 at 20 (bold face in original).

These allegations establish that the loss in business interest in Plaintiffs' venture occurred months before Defendant Lerma's statement regarding Plaintiff's termination.  Given the circumstances, Plaintiff's allegations are insufficient to present a plausible claim that Defendant Lerma's lone comment, which was made well after Plaintiff's credentials had been called into question, foreclosed prospective business opportunities.

For all the reasons above, Plaintiffs have failed to present a plausible claim for a violation of a liberty interest under the Due Process clause.[19]

### 2.  *Plaintiff was not subjected to Cruel and Unusual Punishment*

"The Eighth Amendment, for its part, can only be invoked by persons who have been convicted of crimes."  *Alexander v. Haymon*, 254 F. Supp. 2d 820, 831

---

[18] Plaintiffs voluntarily dismissed their claims against this entity.  *Doc. 8*.

[19] As noted above, under New Mexico law, state constitutional provisions may be interpreted more broadly than their federal analogs.  Plaintiffs' Reply, however, does not address the DASO Defendants' federal due process argument at all, let alone argue that the analysis should be any different in interpreting New Mexico's due process clause.  Without the benefit of any authority to the contrary, the Court dismisses Plaintiffs' state constitutional claims on the same grounds as it dismisses the federal due process claim, i.e., that Plaintiffs have not demonstrated they were deprived of an interest protected by the state due process clause.

(S.D. Ohio Jan. 14, 2003) (citing *Ingraham v. Wright*, 430 U.S. 651, 671 n. 40 (1977).[20]

Plaintiff was not incarcerated so his constitutional claim based on cruel and

unusual punishment fails as a matter of law.

### D.  Title VII

As to the DASO Defendants, Plaintiff's individual capacity claims fail because,

"[u]nder long-standing circuit precedent, supervisors and other employees may not be

held personally liable under Title VII."  *Williams v. W.D. Sports N.M., Inc.*, 497 F.3d 1079,

1083 n. 1 (10th Cir. 2007); *see also Haynes v. Williams*, 88 F.3d 898, 899 (10th Cir. 1996)

("The relief granted under Title VII is against the *employer*, not individual employees

whose actions would constitute a violation of the Act") (emphasis in original).  As to

Plaintiffs' official capacity claims against the DASO Defendants, the Court lacks subject

matter jurisdiction over these claims for failure to exhaust administrative remedies as

set forth above in Section IV.F, *supra*.

### VI.  MEDIA DEFENDANTS

Plaintiffs sue Defendants MediaNews Group (MNG) and Peter Powers

Goodman for articles printed in the Las Cruces Sun-News that allegedly misrepresented

facts about them.  Defendant MNG owns the Las Cruces Sun-News, a daily print and

---

[20] Although this quotation refers to the Eighth Amendment, New Mexico interpreted its analogous constitutional provision in lock-step with their federal counterparts until 1976.  *Gomez*, 932 P.2d at 6.  In 1997, New Mexico adopted the interstitial approach, outlined in the preceding footnote.  *Id.*  As with their due process claim, there is nothing before the Court to suggest that New Mexico has interpreted its cruel and unusual punishment clause more broadly than that of the Eight Amendment such that it would cover individuals like the Plaintiffs.

online newspaper.  Defendant Goodman is a licensed and practicing attorney who contributes to the Las Cruces Sun-News and maintains an online blog.  Plaintiffs' Complaints raise state and federal constitutional claims, a Title VII claim, and a defamation claim against both Media Defendants.[21]

### A.  Factual Allegations

Plaintiffs' Original Complaint outlines the history of several business ventures with which Plaintiffs were involved that either became involved in litigation, filed for bankruptcy, caused Plaintiffs to file for personal bankruptcy, or some combination thereof.  *Doc. 1*, Ex.A-1 at 9-11.  Plaintiffs allege, for example, that one company, Community Fundraisers, Inc., which had appointed Plaintiff as CEO, "was undercapitalized" and "failed leaving monies owed to local schools."  *Id.* at 10.  Plaintiff alleges that Defendant Goodman "exploited" a Los Angeles Times Article regarding this particular venture, as well as other information regarding Plaintiffs' other ventures "to defame, slander and inflict significant emotional damages [sic] pain and suffering to Plaintiff Rick Seeberger."  *Id.* at 10-11.

Plaintiffs' Amended Complaint alleges that Defendant MNG "dba Las Cruces Sun News published a minimum of 7 editorials, articles, or opinions, all with the same basic themes in their effort to exercise an organized and potentially 'criminal in nature' campaign of bullying/cyber-bullying and slanderous printed editorials, articles, and

---

[21] Defendant Goodman incorporates by reference Defendant MNG's Response pursuant to D.N.M.LR-Civ 7.1(a).  *Doc. 123*.

opinions to discriminate, slander, and malign Plaintiff Rick Seeberger." *Id.* at 6. Defendant Goodman wrote at least one of the articles published by Sun-News. *Doc.* 1, Ex. L. Another was published as an editorial by the Sun-News. *Id.*, Ex. O. Plaintiffs attach several of these news items to their Original Complaint but do not otherwise direct the Court to specific statements they allege to be defamatory. *Doc. 1, Exs I - Q.* Instead, they outline a series of defamatory "themes."

The first "theme" concerns statements that Plaintiff was not qualified to serve as Chief of Staff because "he did not have a law enforcement background . . . ." *Id.* at 6. Plaintiff avers that "this is a false and misleading statement" since he "received the equivalent of a Master's Degree in life experience from Doña Ana County in its hiring process." *Id.* at 6-7. Plaintiff further alleges that Defendant Goodman and a reporter for the Sun-News "had access to Plaintiff Seeberger's CV which demonstrates the qualifications Plaintiff had obtained to fulfill the responsibilities as Chief of Staff." *Doc. 119* at 30. Plaintiff goes on to list experiences that he contends qualified him to serve in that position, including "co-le[ading] a nation-changing strategic training initiative in the nation of Paraguay (1997-2006) which saw Paraguay go from the second most corrupt nation in the world to one of the top 10 most improved nations in the world." *Id.*

The second "theme" is based on allegations that "'[m]ultiple' complaints were filed claiming Plaintiffs' training course was religious in nature . . . ." *Id.* at 7. Plaintiffs

allege that statements to this effect were false and misleading because, among other things, (1) the training was reviewed and approved by Sheriff Garrison and Department Manager Victoria Lusk; (2) an independent organization, Universal Investigation Services, reviewed "all four modules . . . and determined they were not religious in nature"; and (3) there were not "multiple" complaints because only one person, Defendant Kinney, filed a complaint.  *Id.* at 7-8.

The third "theme" is that "Plaintiffs had declared bankruptcy and some of their businesses had declared bankruptcy more than one time . . . ."  *Id.* at 8.  Plaintiff alleges "these are false and misleading statements since none of the businesses cited by the *Sun News* were 100% owned by or solely managed or operated by Plaintiffs."  *Id.* (emphasis in original).

The fourth and final "theme" is that Plaintiffs' "involvement in one or more lawsuits did not disqualify Plaintiffs from doing business with or receiving contracts from Doña Ana County."  *Id.*

Plaintiffs' further assert that Defendant Goodman failed to retract "his slanderous opinions" regarding the circumstances of Plaintiffs' prior business ventures and "continued to write articles . . . to further defame, slander and inflict significant emotional damages, pain and suffering to Plaintiffs" even after Plaintiff "advised [Defendant Goodman] of the facts relating to [Plaintiffs' business ventures]."  *Id.* at 10-11.  Furthermore, Plaintiffs aver that, "on or about March 2, 2014," Defendant Goodman

and a Sun-News reporter were each provided with "a free copy of Plaintiffs' book [The Journey]", which included "[a] detailed explanation of the events which occurred in Plaintiffs' lives . . . but chose to ignore its content." *Doc. 119* at 8.

Plaintiffs' assert that after the "deliberate and incomprehensible failure to report in their media presentations more then [sic] just a negative portrayal of Plaintiff Seeberger's character and background," several of Plaintiffs' business ventures "came to a screeching halt." *Doc. 1*, Ex.A-1 at 20. They further allege that the Media Defendants' publications "overshadow the more than 20 years of training and strategic initiatives successfully completed within public, private, and social sector agencies in the United Sates and across the globe. The costs of damages are yet to be completely determined but amount to at least $5,000,000.00." *Doc. 119* at 24.

## A.  State and Federal Constitutional Claims

As an initial matter, Plaintiffs fail to state a claim against the Media Defendants for violations of Plaintiffs' rights under 42 U.S.C. § 1983 or the New Mexico State Constitution. "In order to state a § 1983 claim, a plaintiff . . . must show that the alleged deprivation was committed by a person acting under color of state law." *Bruner v. Baker*, 506 F.3d 1021, 1025-26 (10th Cir. 2007). Similarly, "[i]n order to invoke the protections of our state constitution, there must be some 'state action.'" *State v. Cardenas-Alvarez*, 25 P.3d 225, 243 (N.M. 2001) (J. Baca, specially concurring).

Plaintiffs' sole argument that the Media Defendants should be considered state actors is based on the conclusory allegations that the DASO and County Defendants conspired with the Media Defendants. *E.g.*, *doc. 119* at 25. These bare allegations are insufficient to establish that the Media Defendants were state actors. Accordingly, their state and federal constitutional claims fail as a matter of law.

### B.  Title VII

Plaintiffs' Title VII claim against the Media Defendants fails because the Media Defendants did not employ Plaintiff. *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1069 ("In order to establish a prima facie case under Title VII, [the plaintiff] was required to prove, among other things, that [the defendant] was her employer.").

### C.  Defamation

Plaintiffs contend that the Media Defendants defamed them by publishing false information. New Mexico's pattern jury instructions set forth nine elements for the tort of defamation. Civ. U.J.I. 13-1002 N.M.R.A. In part, Plaintiffs are required to establish that the Media Defendants (1) published a communication (2) containing a statement of fact (3) about Plaintiffs (4) that was false and (5) acted with malice in doing so. *Id.* As set forth above, Plaintiffs identify four "themes" that were, they assert, defamatory. These themes address (1) Plaintiff's lack of law enforcement experience, (2) complaints against him by members of DASO, (3) Plaintiffs' financial difficulties and those of the

48

businesses with which he and his wife were affiliated, and (4) legal issues related to businesses with which he had been involved.

Defendants assert that Plaintiffs have not pled sufficient facts to establish a defamation claim for one or more of the following reasons: the statements complained of (1) were opinions – not facts — and are therefore not actionable, (2) were true or substantially true, (3) were not defamatory, or (4) were not made with malice.  *Doc. 122* at 4-10.  The Court addresses each "theme" below in light of these arguments. Ultimately, the Court concludes that Plaintiffs have failed to state a claim for defamation against the Media Defendants.

### 1.  *First Theme*

The first theme is that Plaintiff's background, particularly his lack of law enforcement experience, rendered him unfit for the DASO Chief of Staff position. Plaintiffs' claims based on this theme fail because the related statements are either true or constitute nonactionable opinions.

Plaintiffs first appear to assert that these statements are false because Plaintiff's other experiences operated as a substitute for a law enforcement background and qualified him for the position of Chief of Staff.  *See e.g.*, *doc. 125* at 4 ("Defendants accessed Plaintiff Rick Seeberger's employment records which verified the life experience credit granted by Doña Ana County.").  While one could conclude that other experiences could compensate for the lack of explicit law enforcement employment, it

does not mean that the declarative statement that Plaintiff lacks a law enforcement

background is untrue.  In fact, Plaintiffs' allegations establish that Plaintiff has not

served as a law enforcement officer.  *Doc. 1*, Ex. A.  Accordingly, to the extent that

Plaintiffs' defamation claim is based upon statements that he lacked a law enforcement

background, it fails to state a plausible claim.

More likely, Plaintiffs' defamation claim under this "theme" is based on the

contention that Plaintiff's lack of law enforcement background did not render him

unqualified due to his other experiences.  However, the Media Defendants' assertions

that Plaintiff was unfit for the position on this, or any other basis, are non-actionable

opinions.  Because an opinion cannot be proven true or false and "a plaintiff must prove

falsity to succeed, it remains nonactionable as a matter of constitutional law."  *Andrews*

*v. Stallings*, 892 P.2d 611, 619 (N.M. Ct. App. 1995) (citation omitted); *Moore v. Sun Pub.*

*Corp.*, 881 P.2d at 741 (If a statement constitutes an opinion, it is "absolutely

nonactionable, even though it might well remain defamatory, that is, injurious to

reputation.").  In assessing whether a statement is an opinion or a fact, New Mexico law

establishes "verifiability as the controlling element," which means that a statement is an

opinion if it "cannot be proved or disproved."  *Moore*, 881 P.2d at 742 (citations

omitted).  The Tenth Circuit has similarly explained that, in certain circumstances, "due

to the subject matter involved, there is simply no objective evidence that could prove

that an allegedly defamatory statement was false." *Jefferson County School Dist. No. R-1 v. Moody's Investor's Services, Inc.*, 175 F.3d 848 (10th Cir. 1999) (citation omitted).

Whether Plaintiff was or was not qualified for the position is not something that can be verified. Plaintiff points out that he met the basic qualifications for the position, but commentary about a public official's qualifications cannot be limited to whether an official meets the minimum job qualifications. Such an understanding would, for example, confine commentary about a presidential candidate's qualifications to whether he or she is a natural born Citizen, over the age of thirty-five, and a fourteen-year resident of the United States. U.S. Const. art. II § 1, cl. 4. Life experience tells us otherwise. Thus, even if Plaintiff met the bare qualifications for the position, such would not preclude the Media Defendants from commenting on his fitness for the position or the Sheriff's decision to place him in the position. *See NBC Subsidiary (KCNC-TV), Inc. v. Living Will Center*, 879 P.2d 6, 13-14 (Colo. 1994) (en banc) (concluding that the statement that a product was not worth the price was not verifiable because "[t]he worth of a given service or product is an inherently subjective measure which turns on myriad considerations and necessarily subjective economic, aesthetic, and personal judgments"), *cited with approval in Jefferson County School Dist.*, 175 F.3d at 853. Accordingly, Plaintiffs' defamation cause of action based on this "theme" fails to state a plausible claim.

2.   *Second Theme*

The second defamatory theme alleged by Plaintiffs is that multiple complaints were filed about Plaintiff's training course being religious in nature, which Plaintiffs assert is false because only one complaint was filed.[22] *Doc. 119* at 7-8.  Plaintiffs' claims based on this theme fail because, assuming that the related statements are materially false, Plaintiffs have not alleged sufficient facts from which the Court can reasonably infer malice on the part of the Media Defendants.

a.   Plaintiff was a public official

The degree of fault that must be established by Plaintiffs to sustain a defamation claim depends on his status as a public official or public figure as opposed to a private person.  "The First Amendment . . . 'prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice.'"  *Revell v. Hoffman*, 309 F.3d 1228, 1232 (2002) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 284 n. 23 (1964)).  Individuals that are private persons, however, need only establish that a false statement was negligently made.  Civ. U.J.I. 13-1002 N.M.R.A..

Public officials are those who "have or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs" and "their position 'has such apparent importance that the public has an independent interest in

---

[22] Plaintiffs list other reasons that this statement is false, but the other reasons in no way demonstrate the falsity of this statement.  *See doc. 119*, at 7-8.

the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees.'" *Gray v. Udevitz*, 656 F.2d 588, 591 (10th Cir. 1981) (quoting *Rosenblatt v. Baer*, 383 U.S. 75 (1966)). The question of whether a person is a public figure is a question of law for the court. *Shuler*, 989 F. Supp. at 1383 (citing *Marchiondo v. Brown*, 649 P.2d 462 (N.M. 1982)).

The Media Defendants assert, without discussion, that Plaintiff is a public official and further argue that Plaintiffs' Complaints fail to establish that the Media Defendants acted with actual malice. *Doc. 122* at 9. Plaintiff does not contest that he was a public official for the purposes of defamation law and appears to agree that he must show malice to prevail. *See doc. 125* at 3-5 (asserting Media Defendants "chose [] to publish ongoing articles . . . all containing false and misleading statements, material misrepresentations, and errors *with malice* as part of their cyber-bullying campaign to defame and discredit the reputation of [Plaintiffs]") (emphasis added).

The circumstances of this case support the parties' conclusion that Plaintiff is a public official. Plaintiff was designated as Chief of Staff to the Sheriff, a title which, on its face, betrays at least the appearance of substantial control over governmental affairs, and an influential role on DASO policies. *See Chief of Staff, Black's Law Dictionary* (10th ed. 2014) (defining chief of staff as "[a]n official of high rank who advises the person in charge of an organization or government"); *American Heritage Dictionary* (5th ed. 2015)

("The highest-ranking staff member at an institution or organization") *OED Online*

(Oxford University Press, June 2015) ("The senior staff officer of a service or

command").

Moreover, Sheriff Garrison reported, and Plaintiff does not contest, that Plaintiff

was to be "a critical component" in "an overhaul of the department" through his

supervision of the implementation of a "strategic plan." *Doc. 1*, Ex. I.  Furthermore, as

Chief of Staff, Plaintiff reported directly to the Sheriff, placing him in the higher

echelons of the organization.  *Doc. 1*, Ex. E.  Finally, Plaintiff's job description identifies

him "as a member of the DASO Executive Staff," who, *inter alia*, was to (1) coordinate

meetings, "the DASO Policy Development/Update Team," and communications

between the Sheriff and his Command Staff, (2) serve as a liaison to other law

enforcement organizations and "support[] the DASO Community Outreach programs,"

(3) "[m]onitor the Sheriffs [sic] organization and operations by reviewing and

evaluating work methods and procedures, and (4) "[d]evelop[] and make[]

recommendations for improving the Sheriffs [sic] operations and processes." *Doc. 1*, Ex.

E.

In sum, the title of Plaintiff's position, the purpose for which it was created, its

location within departmental hierarchy, and the position's duties support the

conclusion that it was of such importance that the public would "ha[ve] an independent

interest in the qualifications and performance of the person who holds it, beyond the

general public interest in the qualifications and performance of all government employees.'"  *Rosenblatt*, 383 U.S. at 86; *Revell*, 309 F.3d at 1232 (retired FBI Associate Deputy Director was a public official because his thirty-year career in "the high echelons of the FBI where he had an influential role in fundamental issues of this country's national and foreign policy"); *cf. Anaya v. CBS Broadcasting Inc.*, 626 F. Supp. 2d 1158, 1201 (D.N.M. May 29, 2009) (holding purchasing agent not a public official because limited discretion over purchases did not amount to substantial control over governmental affairs and public interest did not extend to "someone as far down the bureaucratic chain-of-command as a procurement assistant, whose job is to ministerially carry out the nuts-and-bolts aspects of purchases that have already been devised, approved, and budgeted by others.").  Thus, Plaintiff, as a public official, must meet the actual malice standard to succeed on his defamation claim.

      b.  <u>Plaintiffs allegations do not establish actual malice</u>

"Actual malice exists where a party publishes a defamatory statement '[1] with [actual] knowledge that it was false or [2] with reckless disregard of whether it was false or not.'"  *Revell*, 309 F.3d at 1233 (quoting *New York Times*, 376 U.S. at 280) (brackets in original).  To establish reckless disregard for the truth, "there must be 'sufficient evidence to permit the conclusion that the defendant *in fact* entertained serious doubts as to the truth of his publications.'"  *Revell*, 309 F.3d at 1233 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 730 (1968)) (emphasis in original).  The inquiry is a subjective

one, requiring "sufficient evidence to permit the conclusion that the defendant actually had a 'high degree of awareness of . . . probable falsity.'" *Id.* (quoting *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989). "The motivation behind a publication is a factor to consider in determining whether the evidence shows a publisher acted with actual malice." *Spacecon Specialty Contractors, LLC v. Bensinger*, 713 F.3d 1028, 1042-43 (10th Cir. 2013).

Plaintiffs have not pleaded facts from which the Court can reasonably infer that the Media Defendants knew or recklessly disregarded the fact that only one complaint regarding the religious nature of the trainings was filed.   To begin, although they allege that they informed Defendant Goodman "of facts relating to [their business ventures]," *doc. 1*, Ex. A-1 at 10-11, Plaintiffs do not allege that they informed the Media Defendants of this particular error, which first appeared in the February 28, 2014 article.  *Doc 1*, Ex. I.  Defendant Goodman's March 9, 2014 article contains corrections to his previous column on March 2, 2014, but the allegation of multiple complaints was not among them.  *Id.*, Ex. L.

Plaintiffs' Reply asserts that "[the Media Defendants] had access to the facts and chose not to ignore the facts [sic] demonstrating their biased and slanderous 'news reporting' with the intent of malice." *Doc. 125* at 4.  That the Media Defendants had access to facts but ignored them is unavailing because a "failure to investigate does not in itself establish bad faith." *St. Amant*, 390 U.S. at 733.  More importantly, the articles

themselves establish that Defendant Goodman and a Sun-News reporter did indeed

investigate the matter.  The February 28, 2014, article reads:

> Some attendees of the training sessions filed complaints because of its alleged
> religious subject matter, Seeberger acknowledged.  Seeberger addressed that
> on a limited basis this week, saying an independent Albuquerque firm
> investigated the trainings and examined his curriculum, ultimately finding no
> "basis for the complaint."  He declined to explain the matter further, saying it
> was resolved.

*Doc. 1*, Ex. I at 2.  At the very least, a Sun-News reporter confronted Plaintiff and

afforded him an opportunity to address the allegations.  Plaintiffs' Reply asserts that he

never acknowledged that more than one individual filed a complaint, but he still does

not assert that he expressly informed the Media Defendants that only one complaint

had been filed.

Defendant Goodman's March 2, 2014 article noted "HR Director Deborah Weir

denied the complaints, reportedly ruling that (1) Garrison did tell people they'd get

fired if they didn't attend, but wouldn't really have fired anyone and (2) The

inspirational talks featured Jesus, but in a historical sense, not a religious sense."  *Id.*, Ex.

J at 2.  Further still, Plaintiff concedes that at least one complaint was indeed filed

regarding the purportedly religious nature of the trainings.  Thus, the Media

Defendants appear to have at least inquired into the matter and there existed a basis on

which to believe that more than one complaint had been made, i.e., the filing of at least

one similar complaint and that the HR Director had issued a ruling on the

"complaints."

Finally, Plaintiff has not alleged any facts demonstrating that the Media

Defendants harbored any particular ill will towards Plaintiff, other than their

commentary on his role with DASO.  Rather, the articles appear to target the Sheriff's

decision to create a DASO Chief of Staff position, to place Plaintiff in that position in

light of his background, and to comment on the effect it had on the department.  *See,*

*e.g., doc. 1*, Ex. I at 1 ("New hire has Doña Ana County sheriff optimistic, but has been

criticized"), *id.*, Ex. J at 2 ("Peter Goodman: Garrison hires man with questionable

history as chief of staff") *id.*, Ex. O at 1 ("[Plaintiff] was paid $27 an hour and contracted

to work part time, 30 hours per week . . . That could not have helped improve the

morale of deputies, who are trained and certified law enforcement officers, but make

only a fraction of what [Plaintiff] did, and have long been frustrated by lower pay than

their counterparts with Las Cruces Police").  Indeed, Plaintiff Goodman's March 9, 2014

article stated, "I feel bad about writing all this.  I had coffee with Seeberger on

Wednesday, and he's an affable, intelligent fellow who projects a strong belief in what

he's doing.  But so far, what I've learned, remains troubling."  *Id.*, Ex. L at 2.

In sum, Plaintiff has not pleaded factual allegations that the Media Defendants

were specifically apprised of this relatively minor supposed error, the Media

Defendants had some basis for concluding that the training had been religious in

nature, and the Media Defendants' motivation in writing about the situation was not

based on any particular ill will towards Plaintiff.  As a result, Plaintiffs have failed to

plead sufficient factual matter from which the Court could reasonably infer that the Media Defendants knew their assertion of multiple complaints to be false or published it with reckless disregard for the truth.  Thus, he has failed to present a plausible defamation claim under this "theme."

    *3.   Third Theme*

Plaintiffs' defamation claims based on the third theme fail because the related statements are either true or substantially true.  The third theme is that Plaintiffs "had declared bankruptcy and that some of their businesses had declared bankruptcy more than one time," which Plaintiffs assert are false because "none of the businesses cited by the *Sun News* were 100% owned by or solely managed or operated by Plaintiffs."  *Doc. 119* at 8.  As an initial matter, the articles attached to Plaintiffs' Complaints state only that one of Plaintiffs' businesses had filed for multiple bankruptcies, not "some."  *See Doc. 1*, Exs I – Q.

"To support a claim for defamation, the asserted statement of fact must be false in a material way; insignificant inaccuracies are insufficient."  *Heyward v. Credit Union Times*, 913 F. Supp. 2d 1165, 1188 (D.N.M. December 17, 2012) (citing Civ. U.J.I. 13-1006 N.M.R.A.).  In other words, "It is not necessary to prove the literal truth of statements made.  Slight inaccuracies of expression are immaterial provided the defamatory charge is true in substance, and it is sufficient to show that the imputation is 'substantially' true."  *Franklin v. Blank*, 525 P.2d 945 (N.M. Ct. App. 1974), *superseded by statute on other*

*grounds*, New Mexico Review Organization Immunity Act (NMROIA), N.M. STAT. ANN.
§§ 41–9–1 to –7 (1978), *as recognized in Leyba v. Renger*, 845 P.2d 780 (N.M. 1992).  The
Supreme Court has also explained that "[m]inor inaccuracies do not amount to falsity
so long as 'the substance, the gist, the sting, of the libelous charge be justified.'"  *Masson
v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991) (quoting *Heuer v. Kee*, 15 Cal. App.
2d 1063, 1064 (Cal. Dist. Ct. App. July 2, 1936)).

First, Plaintiffs do not allege that statements that they had personally filed for
bankruptcy are untrue.  As such, they fail to state a claim for defamation with respect to
those factual allegations.  Plaintiffs do, however, allege that the assertion that some of
their businesses had filed for *multiple* bankruptcies is untrue.  The specific statements at
issue are as follows:

- On March 2, 2014, Sun-News published an article by Defendant Goodman
  that read, "One of his [Plaintiff's] corporations has filed for bankruptcy three
  times – each time shortly after a judge issued an order against Seeberger."
  *Doc. 1*, Ex. J at 2.  Later, the article lists several of Plaintiff's businesses,
  including The 20-20 Leadership Foundation.  The article goes on to explain:

  > 20-20 Leadership filed for bankruptcy in Texas, then withdrew the
  > filing when the bankruptcy judge made an order Seeberger didn't
  > like; then Seeberger filed bankruptcy for 20-20 in New Mexico, but
  > the court wouldn't have it.  Near as I can tell, 20-20 has filed
  > bankruptcy three times.

- On March 9, 2014, Sun-News published another article by Defendant
  Goodman, which addressed the contents of a book co-written by Plaintiffs
  titled, "The Journey."  He then noted, "Their [Plaintiffs'] history includes two
  personal bankruptcies, some corporate bankruptcies, and plenty of lawsuits."
  *Doc. 1*, Ex. L at 1.

With respect to the March 9, 2014 article, Plaintiffs have not alleged sufficient factual matter to demonstrate that the statement made by Defendant Goodman was false at all, let alone false in a material way.  This is because Plaintiffs' assertions of falsity are limited, somewhat hyper-technically, in scope.  Plaintiffs do not claim that none of the businesses they have "100% owned" or "solely managed or operated" have ever gone bankrupt; rather, they assert that "*none of the businesses cited by the Sun News*" had done so.  *Doc. 119* at 8.  Defendant Goodman's statement regarding the Seebergers' history, however, is not so confined.  Rather, the statement appears to be based on Defendant Goodman's reading of Plaintiffs' co-written book, "The Journey."  The context in which the statement is made demonstrates this point and requires quoting the article at length:

> Seeberger suggested I read "The Journey," a book he co-wrote with his wife and self-published in 2012.  (When I picked up the book I had to sign and date an acknowledgment that I'd received it from him.)
>
> He said it showed their life journey to where they are now, and said it illustrated how they'd learned from their mistakes.  I thought it might be . . . well, I hoped maybe . . . a come-to-Jesus confession of sin and redemption and genuine change and growth.
>
> But the "mistakes" mostly involve trusting others who prove untrustworthy.  So far, there's no hint that the Seebergers were ever really at fault for anything.  There are allegations of fraud and betrayal against many people and businesses, most unnamed.
> Their history includes two personal bankruptcies, some corporate bankruptcies, and plenty of lawsuits.  Seeberger says he himself is currently involved in five lawsuits.

*Doc. 1*, Ex. L at 1.  Thus, Defendant Goodman's statement regarding corporate bankruptcies appears to derive from Plaintiffs' book.

Even assuming Defendant Goodman was not referencing "The Journey" as his source, his statement regarding the Seebergers' "history" as including "some corporate bankruptcies" cannot be read as confined to the businesses listed by Sun-News in an earlier article.  And Plaintiffs do not allege that their history does not include "some corporate bankruptcies."  As a result, their claim fails as to the Media Defendants' statement on March 9, 2014, because they have not alleged and do not assert it to be false.

Further still, even assuming Defendant Goodman's statements in both the March 2 and March 9 articles were confined to businesses listed in the former, the fact that the Seebergers' did not "100% own" or "solely manage[] or operate[]" them, does not establish a material falsity because degree of Plaintiffs' involvement at least one of the businesses cited makes the imputation that it was their business substantially true. *Franklin*, 525 P.2d at 948.  As noted above, although Plaintiffs assert falsity on the grounds that the Media Defendants asserted "some of their businesses had declared bankruptcy more than one time," the articles demonstrate that the Media Defendants only asserted that one of the businesses had filed for multiple bankruptcies.  The March 2, 2014 article reads, "One of his corporations has filed for bankruptcy three times . . ." and continues, "Near as I can tell, 20-20 has filed bankruptcy three times."  *Doc. 1*, Ex. J

at 2.  Again, Plaintiffs do not claim this to be false, but challenge the statement on the grounds that the business was not entirely owned or run by Plaintiffs.  However, Plaintiff's CV states that from 2000 to 2012, "Rick and sue served as founders and directors of The 20-20 leadership foundation . . . ." *Doc. 1*, Ex. A at 4.  Moreover, filings as late as August 1, 2013, in one of 20-20's bankruptcy cases provide the businesses address as Plaintiffs' home address and was signed by Plaintiff, the Executive Director, as an individual "authorized to file this petition on behalf of [The 20-20 Leadership Foundation]."[23] Voluntary Petition under Chapter 7, In re The 20-20 Leadership Foundation, No. 13-31254-HCM (Bnkr. W.D. Tex. Aug. 1, 2013), ECF No. 1.  Thus, even assuming others were involved in this business, the statements in the March 2, 2014 article that a business that was Plaintiff's had filed multiple bankruptcies is substantially true.  As such, Plaintiffs have failed to present a plausible defamation claim under this "theme."

 *4.  Fourth Theme*

  Plaintiffs' claims based on the fourth theme fail because the related statements are either true or constitute nonactionable opinions.  Plaintiffs' fourth theme alleges that Plaintiffs' involvement in multiple law suits did not render them unfit to work for, or contract with, the County.  The allegations also do not assert that Plaintiffs have not

---

[23] The Court may take judicial notice of filings in a bankruptcy proceeding without converting a motion to dismiss to a motion for summary judgment, as they are "facts which are a matter of public record."  *Rose v. Utah State Bar*, 471 F. App'x 818, 821 (10th Cir. 2012) (unpublished) (citation omitted); *see also In re* Padilla, Bnkr. No. 7–09–15203 JR, 2010 WL 4735820, at *2 (Bnkr. D.N.M. Nov. 16, 2011) (taking judicial notice of documents filed in the plaintiff's bankruptcy case).

been involved in litigation.  Because such statements are not false, they are not

actionable.  Moreover, as set forth in Section V.B.1, opinions regarding Plaintiff's fitness

for the DASO Chief of Staff position are not actionable.  Thus, Plaintiffs have failed to

present a plausible defamation claim under this "theme."

     *5.  Conclusion*

Plaintiffs did not direct the Court to any particular statements that they assert to

be defamatory.  After reviewing statements made in the newspaper articles attached to

Plaintiffs' in light of the allegedly defamatory "themes" described by Plaintiffs, the

Court concludes that the allegations in Plaintiffs' Complaints fail to establish any

plausible claims for defamation against the Media Defendants.

## V.    NOTICES OF DEFAULT

 "When a party against whom a judgment for affirmative relief is sought has

failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise,

the clerk must enter the party's default."  Fed. R. Civ. P. 55(a).  Plaintiffs have asserted

multiple times that the DASO Defendants and Defendant Goodman are in default

because they failed to timely file responsive pleadings.  *Docs. 21-23, 90-92, & 103*.  The

Court finds that, because the DASO Defendants and Defendant Goodman were not

properly served in either state or federal court and they have taken measures to

defendant against both of Plaintiffs' Complaints, entries of default and default

judgment are not warranted.

### A.  Pre-Removal Proceedings

"[F]ederal courts in removed cases look to the law of the forum state . . . to determine whether service of process was perfected prior to removal." *Wallace v. Microsoft Corp.*, 596 F.3d 703, 706 (10th Cir. 2010).  As to Defendant Goodman, there is no indication that he was served prior to removal.  *See generally doc. 1* (attaching state court documents, including summons for all Defendants except Defendant Goodman).  As to the DASO Defendants, they do not appear to have been properly served because service was executed on a person with whom they claim to have no affiliation or connection.  *Doc. 33* at 2; Rule 1-004(F) N.M.R.A. (providing methods for effecting personal service).  Thus, these Defendants were not properly served in state court.  In apparent recognition of this shortcoming, after the case was removed to this court, Plaintiffs submitted new Affidavits of Service for Summons for Defendant Goodman and the DASO Defendants.  *Docs. 36-40, 66*.

### B.  Post-Removal Proceedings

1. *An entry of default is not warranted against either the DASO Defendants or Defendant Goodman*

Having determined the DASO Defendants and Defendant Goodman were not properly served in state court, the next question is whether they were properly served

in federal court, and, if so, when such service occurred.[24]  "After removal, federal rather

than state law governs the course of the later proceedings," including the required

method of service.  *Wallace*, 596 F.3d at 706 (citing 28 U.S.C. § 1448 and FED. R. CIV. P.

81(c)).  The docket reflects that Plaintiffs filed affidavits of service for these Defendants

on January 28, 2015, and February 5, 2015.  *Docs. 36-40, 66.*  For service to be effective,

however, "[a] summons must be served with a copy of the complaint."  FED. R. CIV. P.

4(c)(1).  Plaintiffs' Affidavits of Service do not indicate that a copy of the complaint was

delivered.  *Docs. 36-40, 66* (providing that the person attempting service served only a

"copy of [the] Summons").  Thus, Plaintiffs' attempts at service in federal court also fall

short.  And, because "[d]efault cannot be entered where there was insufficient service of

process," *Scott v. District of Columbia*, 598 F. Supp. 2d 30, 36 (D.D.C. Feb. 19, 2009),

neither Defendant Goodman nor the DASO Defendants are subject to an entry of

default.

Even assuming the post-removal affidavits evidenced effective service, an entry

of default against the DASO Defendants would not be warranted.  A defendant has 21

days after being served with a summons and the complaint to file an answer. FED. R.

CIV. P. 12(a)(1)(A)(i). The attempted service in federal court occurred on January 27,

---

[24] Plaintiffs assert that Judge Lynch ordered all Defendants to file responsive pleadings deadline no later than December 23, 2014.  *Doc. 5.*  However, Judge Lynch's order was limited to "[a]ll properly-served Defendants."  *Id* at 2.  Given this limitation, the issue still turns on when service occurred, if at all.

2015, for Defendants Lerma and Long, and February 5, 2015, for Defendant Kinney.

*Docs. 36-40, 66.*  These Defendants filed an answer and counterclaim on February 16,

2015, *doc. 85*, which is less than twenty-one days after the purported service.  Therefore,

even assuming effective service, they timely filed responsive pleadings.

> 2. *Assuming effective service on Defendant Goodman, Default Judgment is still not warranted*

"'[S]trong policies favor resolution of disputes on their merits'" such that

'"default judgment must normally be viewed as available only when the adversary

process has been halted because of an essentially unresponsive party.'"  *Cessna Fin.*

*Corp. v. Bielenberg Masonry Contracting, Inc.*, 715 F.2d 1442, 1444 (10th Cir. 1983) (quoting

*Jackson Beech*, 636 F.2d 831, 836 (D.C.Cir. 1980)).  Under Plaintiffs' time frame, the

Motion to Dismiss the Original Complaint filed by Defendant Goodman was only two

days late.  Since then, Defendant Goodman has taken several measures evidencing his

intent to defend against this lawsuit, such as contesting Plaintiffs' notice of default as to

him, moving to strike Plaintiffs' first attempt to amend their complaint, and seeking

denial of Plaintiffs' subsequent attempt to file an amended complaint.  *Doc. 109, 111, &*

*123.*  Assuming this constitutes a failure to "plead or otherwise defend," which does not

seem to be the case, Defendant Goodman would only be required to show good cause

to have an entry of default overturned.  Fed. R. Civ. P. 55(a), (c).  Given Defendant

Goodman's actions in defending against Plaintiffs' suit, the Court concludes that default

judgment is not warranted under these circumstances.

## VI.    SUPPLEMENTAL JURISDICTION

Having denied Plaintiffs' Motion for Leave to Amend and granted all of the

Defendants' Motions to Dismiss, the sole remaining claims in this case are those raised

in the DASO Defendants' Counterclaims, which consist only of state claims. *Doc. 85*

(bringing claims for malicious abuse of process and tortious interference with

prospective employment relationship).

The Court may refuse to exercise supplemental jurisdiction where it "has

dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). This

case was removed on the basis that the Court had federal question jurisdiction over the

§ 1983 and Title VII claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction

over the related state claims pursuant to 28 U.S.C. § 1367(a). *Doc. 1* at 2-3.[25] The DASO

Defendants counterclaims are likewise predicated on supplemental jurisdiction

grounds. *Doc. 85* ("This Court has jurisdiction over the counterclaims . . . pursuant to 28

U.S.C. § 1367."). However, as a result of this order, the basis on which this Court had

original jurisdiction—federal question—has dropped out of the picture and no other

basis for original jurisdiction has been asserted. In such circumstances, "'the most

common response . . . has been to dismiss the state law claim or claims without

prejudice . . . .'" *Roe v. Cheyenne Mountain Conference Resort*, 124 F.3d 1221, 1237 (10th

---

[25] Furthermore, the time frame for amending the notice of removal has long since expired and, in any event, "[i]n most circumstances . . . defendants may not add completely new grounds for removal or furnishing missing allegations, even if the court rejects the first-proffered basis of removal.'" *Thompson v. Intel Corp.*, No. CIV 12-0620 JB/LFG (D.N.M. Aug. 27, 2012) (quoting 14C Charles Alan Wright & Arthur Miller, *Federal Practice and Procedure* § 3733 (4th ed. 2009)).

Cir. 1997) (quoting *Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995) (internal brackets omitted)).  Seeing no reason to depart from the normal practice, the Court will refuse to exercise supplemental jurisdiction over the DASO Defendants' state law counterclaims.  The counterclaims are, therefore, dismissed without prejudice.

## VII.   CONCLUSION

The Court has reviewed both Plaintiffs' Complaint and the proposed Amended Complaint to determine if they present any plausible claims under the standard laid out in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  As described above, the non-conclusory factual allegations in the Complaint, even if augmented by those contained in the proposed Amended Complaint, fail to present any plausible claims.  Moreover, the single new putative cause of action in the proposed Amended Complaint (Federal Whistle Blower Act claim) fails to state a plausible claim.  Therefore, the Motions to Dismiss by all of the Defendants, *docs. 13, 16, 32, & 89*, are GRANTED, and the Plaintiffs' Motion of Leave to File Amended Complaint, *doc. 117*, is DENIED on futility grounds.  Plaintiffs' claims in the Original Complaint are hereby DISMISSED without prejudice.

Furthermore, Plaintiffs' assertions of default are without merit because of the defects in service.  Even assuming proper service, default and default judgment are not warranted under the circumstances of this case.  Therefore, Plaintiffs' requests for default and default judgment, *docs. 21, 22, 23, 90, 91, 92, & 103,* are DENIED.

Finally, having dismissed the federal claims, which eliminated the basis for original jurisdiction, the Court declines to exercise supplemental jurisdiction over the DASO Defendants' counterclaims, which include only state claims. *See doc. 85.* The DASO Defendants' counterclaims are DISMISSED without prejudice.

IT IS SO ORDERED.

GREGORY B. WORMUTH
United States Magistrate Judge
**Presiding by Consent**